UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KEDRON GASTON,

     Plaintiff,

     v.                                                    Case No. 3:21-CV-896 JD

JACKIE C. HAZELTINE, et al.,

     Defendants.

**<u>OPINION AND ORDER</u>**

On February 2, 2023, Plaintiff Kedron Gaston ("Kedron") filed a second motion for partial summary judgment. In this motion, Kedron seeks summary judgment on the duty and breach of duty elements of her spoliation claim against Defendant Grange Mutual Casualty Company ("Grange"). For the reasons explained below, the Court will grant this motion in part and deny this motion in part.

**A.      Factual Background**

On a foggy day in 2015, Plaintiff Kedron Gaston was a passenger in a car which collided with a stopped semi-truck driven by Jackie Hazeltine and owned by his employer Royal Paper Stock Company, Inc. Kedron and her mother, Jessica Gaston, were injured during the crash. (DE 12 ¶¶ 16, 61.) The driver of the car, Kedron's aunt Cheryl Koehler, was decapitated. (*Id.* ¶ 16; DE 63-8 at 116:24–117:1.) Due to her injuries, Jessica Gaston was unable to care for Kedron, causing Kedron to move into foster care. (DE 81-2 ¶ 6.)

When investigating the crash, Royal Paper and Hazeltine's insurer, Grange, hired Cooper Barrette Consulting and Adam Hyde to perform testing on the trailer lighting system of the semi-truck. (DE 35-3 at 18; DE 41 at 2 (explaining that "Grange retained attorney Jennifer Davis . . .

to represent Mr. Hazeltine and Royal Paper's interests" and that Ms. Davis then "retained expert

Adam Hyde of Cooper Barrette Consulting").) Hyde issued a report on March 1, 2016, which

found that one of four lights on the back of the truck was not "functioning at the time of the

inspection" and failed to illuminate. (DE 87-5 at 6.) This non-functional light was the third light

from the left on the rear side of the truck ("Light Number 3"). Hyde noted that, during a "cursory

inspection of the lights, [the bulb of Light Number 3] was found to be broken" and that "[u]pon

further examination through the red lens, I found parts of the bulb unit were broken resting at the

base of the unit." (*Id.* at 7.) This initial inspection was not invasive or destructive. (Hyde

Deposition, DE 81-3 at 161:3–6.) Hyde limited his inspection in this way because that was what

Jennifer Davis, Grange's retained attorney, directed him to do. (*Id.* at 161:10–15.)

Davis then instructed Hyde to perform other testing. (*Id.* at 161:16–19.) Following this

direction, Hyde conducted additional field testing on the rear facing lights on July 23, 2016. (DE

87-6 at 3.) Hyde examined the lights while still affixed to the truck before proceeding to remove

the light assemblies from the truck. (*Id.* at 5–8.) Hyde then cut through the back side of the

assembly of Light Number 3 to access and view the bulb and filaments. (*Id.* at 6.) According to

Hyde, rather than being broken as he earlier reported, the bulb was found to be undamaged and

intact. (*Id.* at 6–7.) Hyde stated that the filament displayed a condition known as "hot shock,"

where during a crash "the ductile filament is suddenly accelerated and, due to the inertia, it

stretches and uncoils." (*Id.* at 11.) Partially relying on the hot shock, Hyde concluded that all

"four taillights were illuminated at the scene of the crash." (*Id.* at 13.)

The parties dispute the impact the July 23, 2016, testing had on the condition of the brake

light evidence. According to Kedron's expert Paul Thogersen, Hyde failed to properly preserve

the condition of the brake lights during this examination. (DE 81-5 ¶ 6.) For example, Thogersen

finds that "the condition of the lighting connectors" was not preserved and that "[d]irt and dust deposits on the lamp housings were removed which removes and alters evidence of the connections to the lamps." (*Id.*) Thogersen concludes that based on inconsistencies in Hyde's report, "it is impossible to draw conclusions about the status of the lamp at the time of the collision." (*Id.* ¶ 7.) Defendant's expert, Erik Anderson, determined that there was sufficient evidence to determine if the right-inside taillight was energized and illuminated at the time of impact, finding that the "cutting of the plastic rear housing on [July 23, 2016] did not and does not prevent the examination and analysis of the bulb filaments for hot-shock." (DE 87-1 at 15.)

On November 2, 2021, Plaintiff Kedron Gaston filed this lawsuit, bringing two claims: (1) negligence and negligent infliction of emotional distress against Hazeltine and Royal Paper, which alleges that the stopped truck did not have active taillights or brake lights at the time of the accident and that there were no other mechanisms to alert approaching drivers of the truck's presence in the fog; and (2) spoliation of evidence against Grange, alleging that Hyde took the taillights and brake lights ("lighting system") from the truck and performed destructive testing, thereby making crucial evidence unavailable. (DE 9 at 3, 11.)

Plaintiff moved for partial summary judgment, which the Court denied on January 24, 2023. Then, on February 2, 2023, Kedron filed a second motion for partial summary judgment. This motion is now ripe for review.

### B.    Legal Standard

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may be granted only if no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). There must be more than a mere scintilla of evidence in support of the opposing party's position and "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009); *Anderson*, 477 U.S. at 252. Instead, the opposing party must have "evidence on which the jury could reasonably find" in his or her favor. *Anderson*, 477 U.S. at 252.

## C.    Discussion

Indiana recognizes spoliation as an independent tort, which "is analyzed either as a species of negligence or under the rubric of intentional interference with prospective or actual civil litigation." *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005); *see also Thompson ex rel. Thompson v. Owensby*, 704 N.E.2d 134, 140 (Ind. Ct. App. 1998). A defendant is liable in Indiana for negligent spoliation if a plaintiff shows the other party alleged to have lost or suppressed the evidence owed a duty to the person bringing the spoliation claim to have preserved the material, "that the duty was breached, that [the plaintiff was] harmed by the breach, and 'that the harm resulted in damages that can be proven with reasonable specificity.'" *J.S. Sweet Co.*, 400 F.3d at 1034 (quoting *Thompson*, 704 N.E. 2d at 140)).

In her motion, Kedron argues that partial summary judgment must be granted on the elements of duty and breach of duty in its spoliation claim. Before addressing Kedron's

arguments on these elements, the Court must address an issue that neither party raised: whether Kedron should be permitted to file a successive motion for summary judgment.

### (1) Successive motion for summary judgment

A district court may allow a party to file successive motions, particularly if there is a good reason. *Whitford v. Boglino,* 63 F.3d 527, 530 (7th Cir. 1995). Allowing a successive motion for summary judgment is especially appropriate "if one of the following grounds exists: (1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) need to correct clear error or prevent manifest injustice." *Id.* In considering whether to allow a successive motion, the Court also takes into account whether addressing the second motion promotes judicial economy. *See Gordon v. Veneman*, 61 F. App'x 296, 298 (7th Cir. 2003) ("Permitting a second summary judgment motion is essentially a decision concerning case management, and district court judges are in the best position to make such decisions.").

Kedron's second motion for summary judgment does not present an intervening change in controlling law or a need to correct clear error. In her first motion for summary judgment, Kedron argued that Grange was collaterally estopped from relitigating the spoliation of the lighting system, based on prior findings adjudicated in a state trial court. (First Motion for Partial Summary Judgment, DE 33 at 6 ("It is requested that this Court grant Kedron partial summary judgment and apply the doctrine of offensive collateral estoppel to preclude Defendants from relitigating the same fact (spoliation of the lighting system) previously adjudicated by the state trial court.")). The Court denied this motion, explaining that the "same issue requirement [for collateral estoppel was] not met as to Grange" because the state trial court did "not mention Grange at all," but "only issued findings as to . . . Mr. Hazeltine and Royal Paper." (DE 77 at 11–

12.) Kedron now asserts that the record supports granting summary judgment as to duty and breach of duty on the merits. (DE 78 at 3.) In no way does this successive motion seek to correct an error in this Court's previous order or point to an intervening change of law since that order was issued.

A second motion for summary judgment could also be warranted if Kedron has some new piece of evidence that required her to bring this motion after her initial motion. Yet all the information that Kedron relies on was in her possession before filing the first motion for summary judgment. For example, Kedron's two experts on the condition of the brake lights, Paul Thogersen and Jessica Ellis, both submitted identical affidavits in support of her first and second motion for summary judgment. (Ellis Affidavit, DE 35-11; Ellis Affidavit, DE 81-1; Thogersen Affidavit, DE 35-6; Thogersen Affidavit, DE 81-5.) Similarly, Kedron submitted the same deposition of Adam Hyde in support of both motions for summary judgment. (Adam Hyde Deposition, DE 35-4; Adam Hyde Deposition, DE 81-3.)

Other exhibits, while not submitted in support of her earlier motion for summary judgment, do not constitute new evidence because the exhibits or the information contained in those exhibits were available long before the filing of the first motion for summary judgment. Two exhibits submitted in support of Kedron's second motion for summary judgment fall into this category: a guardianship order and an affidavit from a neuropsychologist. The guardianship order shows that the Wabash County Circuit Court appointed a guardian for Jessica Gaston after determining she was incapacitated. (DE 81-4.) This order was from February 2, 2018, more than four years before Kedron filed her first motion for summary judgment. Similarly, an affidavit from Doctor Polly Westcott concludes that "[r]ecords from Lutheran Hospital document Kedron sustained a traumatic brain injury, a linear skull fracture, and soft tissue hematoma [and that a]

CT of the brain revealed a possible nondisplaced linear skull fracture near the junction of the temporal and parietal bones." (DE 81-2 ¶ 5.) This affidavit fails to say when Kedron's traumatic brain injury was sustained. But Kedron uses this affidavit to argue that the severity of Kedron's injuries notified Grange of the need to properly preserve physical evidence by the time the July 23, 2016, testing took place. (DE 79 at 7.) For such an argument to have merit, Kedron's injuries had to have occurred before July 23, 2016. Accordingly, the information in that affidavit was available long before the date Kedron filed her first motion for summary judgment.

The last exhibit Kedron includes in support of her second motion for summary judgment is an expert report from Paul Thogersen, which is dated November 15, 2022. (DE 81-6.) While this report is dated after the first motion for summary judgment, the information in the report cited to by Kedron was readily available prior to submitting that first motion. The only citation Kedron has to Thogersen's report in her second motion for summary judgment is to its finding that"[t]he inconsistency between the described conditions of the lamp in the two reports [by Adam Hyde], as if different lamps were examined during the two inspections, make it impossible to draw conclusions about the status of the lamp at the time of the collision based on Mr. Hyde's reports." (DE 79 at 8.) But Hyde's two reports, on their face, display this inconsistency—given that Hyde first indicates that the bulb was broken, but then indicates that the bulb was intact— and those reports were issued on March 1, 2016, and October 15, 2016. Furthermore, Thogersen's affidavit submitted in support of the first motion for summary judgment contains the very same conclusion. (DE 35-6 ¶ 7 ("I have also determined that due to the inconsistency between the described condition of the lamp in the two reports submitted by Defendants' expert, Adam Hyde, it is impossible to draw conclusions about the status of the lamp at the time of the collision.").

Given that all the information Kedron relies on to support her second motion for summary judgment was previously known before she filed her first motion for summary judgment, there is no new evidence justifying the delay in raising her arguments. Kedron rather took a wait-and-see approach to summary judgment: raising one set of arguments in her first summary judgment motion, while holding others back for a second if the Court disagreed. Such an approach is disfavored, as it draws out the case, requires the Court to examine the record multiple times, and flouts page limit requirements. *See Ortiz v. City of Chicago*, 2011 U.S. Dist. LEXIS 53206, *12 (N.D. Ill, May 18, 2011) ("[T]he Court would not permit Defendants to raise this new argument [because] Defendants do not explain why they could not have made this argument on the first go-round.").

Even though these issues could have been raised earlier, judicial economy may still justify granting a successive motion for summary judgment. *See Gordon*, 61 F. App'x at 298 (explaining that a judge may properly conclude "that it was better to allow a second summary judgment motion than risk wasting judicial resources on a claim that should never have made it to trial. . . [in line with] the well-established principle that district courts have broad discretion to manage their own dockets"). The Court finds that judicial economy only favors partial consideration of Kedron's motion.

Plaintiff is moving for summary judgment on the elements of duty and breach of duty in her spoliation claim. Plaintiff has not moved for summary judgment on the elements of causation or damages. A defendant is liable in Indiana for negligent spoliation if a plaintiff shows the party alleged to have lost or suppressed the evidence owed a duty to the person bringing the spoliation claim to have preserved the material, "the duty was breached, that [the plaintiff was] harmed by the breach, 'and that the harm resulted in damages that can be proven with reasonable

specificity.'" *J.S. Sweet Co.*, 400 F.3d at 1034 (quoting *Thompson*, 704 N.E. 2d at 140). The damage that must be proven is damage to Kedron's underlying negligence claim. *See Dobrijevich v. Ford Motor Co*., No. 2:05-CV-241 PS, 2006 WL 8452670, at *2 (N.D. Ind. Oct. 19, 2006) (finding that because "there is no underlying claim . . . Plaintiffs are unable to prove [the required element] of damages" and so "summary judgment in favor of [the insurer] is also appropriate"); *see also Rackemann v. LISNR, Inc*., No. 117CV00624TWPMJD, 2018 WL 4693524, at *5 (S.D. Ind. May 21, 2018) (finding that the "injury in a spoliation claim is the negative impact of the destruction of evidence upon a litigant's ability to prevail on its lawsuit . . . in other words, the harm suffered . . . would be the negative impact upon this litigation, occurring in Indiana").

The Court finds that consideration of duty will further judicial economy, but that addressing breach of duty does not further judicial economy. As to duty, this is a question of law that the Court decides. *Lockwood v. Bowman Const. Co*., 101 F.3d 1231, 1234 (7th Cir. 1996) ("The existence of a duty is a question of law for the court to decide, and if the defendant owes no duty to the plaintiff, the plaintiff cannot prevail." (citing *Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514, 517 (Ind. 1994)); *Aldridge v. Cargill Inc*., No. 2:12-CV-424-PRC, 2014 WL 1414882, at *4 (N.D. Ind. Apr. 10, 2014) ("[W]hether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide."). The Court notes that it would have been better for Kedron to make this argument in her first summary judgment motion. That approach would have enabled the Court to resolve the issue in one order, alongside other arguments, rather than in a piecemeal fashion. But because this Court must eventually decide whether Grange owed a duty toward Kedron, and because duty has been fully briefed, the Court will consider that issue in this order.

Unlike duty, breach of duty is not an issue of law that this Court must decide. In fact, "summary judgment 'is rarely appropriate [in a negligence case on breach of duty] because negligence cases are particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence.'" *Williams v. Norfolk S. Corp.*, 322 F. Supp. 3d 896, 902 (N.D. Ind. 2018) (quoting *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004)). Furthermore, granting summary judgment on breach of duty would not save any judicial resources. *See Lach v. U.S. ex rel. Dep't of the Interior*, No. 2:08 CV 251, 2012 WL 1189619, at *2 (N.D. Ind. Apr. 6, 2012) ("Avoiding an unnecessary trial also may constitute good cause for considering a successive motion for summary judgment."). There would still have to be a trial on the following: (1) the underlying negligence claim against Hazeltine and Royal Paper; and (2) the elements of causation and damages in the spoliation claim against Grange. Ruling on the motion for summary judgment as to breach of duty would also not streamline the potential trial. To prove causation, the jury would have to learn of both the nature of the breach and the significance of the breach in order to understand how it impacted the underlying negligence claim. This evidence would overlap with the evidence that would be needed to prove the breach itself. Therefore, all parties would still have to undergo the time and expense of a trial even if the Court did not consider the new arguments on breach of duty.

Kedron, in her second motion for summary judgment, briefly states that summary judgment is appropriate on duty and breach of duty because it will "allow for the parties to have a better understanding moving forward when considering settlement and trial." (DE 79 at 13.) Such an argument is speculative. This Court stating that it will not decide the breach of duty question provides almost as much clarity as deciding it. It provides the parties with the

information that a jury will be tasked with determining whether Grange breached any duty. How the parties utilize that information, and whether it promotes settlement, is completely unknown.

Accordingly, because duty is a question of law that this Court must decide, it will consider it. That said, the Court exercises its discretion and does not consider Kedron's arguments as to breach of duty. Kedron's argument as to breach of duty should have been raised in the first motion for summary judgment and considering it now does not further judicial economy. Other courts have exercised their discretion in similar ways previously. *See, e.g.*, *Divane v. Krull Elec. Co.*, No. 95 C 6108, 2002 WL 31844987, at *1 (N.D. Ill. Dec. 18, 2002) ("No good reason exists to allow Curry to file a second motion for summary judgment. No change in applicable law has taken place, no new evidence has come to light, and no error is alleged to have occurred. Rather, Curry's reason for conducting this litigation in this piecemeal fashion is that doing so is easier for him. . . This court has neither the time nor the inclination to consider arguments one at a time in serial motions . . . ."); *Amari Co. v. Burgess*, No. 07 C 1425, 2008 WL 268698, at *6 (N.D. Ill. Jan. 28, 2008) (noting that the "Court has no obligation to entertain serial motions" and that "[t]he fact that Plaintiffs acted precipitously in bringing this motion does not constitute 'good reason' to raise the issue again").

### *(2) Duty*

In determining whether there is a duty of care, Indiana law directs the Court to consider the relationship between the parties, the reasonable foreseeability of harm to the person injured, and public policy concerns. *Looney v. Nestle Waters N. Am., Inc.*, 187 N.E.3d 867, 873 (Ind. Ct. App. 2022). These factors are known as the *Webb* factors, after *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991); *see also Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 392 (Ind.

2016) (explaining that there must be "some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it").

The Court in *Thompson ex rel. Thompson v. Owensby*, 704 N.E.2d 134, 137 (Ind. Ct. App. 1998) analyzed each of the *Webb* factors before holding that a liability insurer owed a duty to a third-party under Indiana law. In that case, an insurer took possession of a dog restraining cable as evidence related to a dog bite claim, but proceeded to lose it. *Id.* at 134. The court first found that there was a relationship between the parties because the insurance company "knew or should have known of the likelihood of litigation and of the claimant's need for the evidence in the litigation." *Id.* The court then found that the harm was foreseeable because, "if an insurance carrier's investigator deems certain evidence important enough to be collected, [and if litigation is foreseeable], it is foreseeable that loss of the evidence would interfere with a claimant's ability to prove the underlying claim." *Id.* at 138. Finally, the court held that public policy supported a duty because it was "[r]easonable for the law to require the claims resolution practices be responsible, because the carrier has the unique experience and ability to structure its practices to avoid harm." *Id.* at 139–40.

*Thompson*, along with *Webb*, show that there are three important factors to consider in determining whether a liability insurer owes a third-party a duty: (1) whether the insurance company knew of the likelihood of litigation by that third-party; (2) whether the insurance company knew of the importance of a given piece of evidence; and (3) whether that evidence was in the possession of the insurer at the time of spoliation.

Grange argues that, unlike *Thompson*, Kedron failed to notify Grange that it was planning to bring any claims. Therefore, according to Grange, it did not know of the likelihood of litigation, and had no reason to know. (DE 86 at 7.) Grange also argues that it did not have

possession of the lighting system on July 23, 2016, and so could not be held responsible for any alteration. The resolution of these two issues turns largely on whether Adam Hyde was acting as a subagent of Grange on July 23, 2016.

### (a) Adam Hyde acted as a subagent of Grange

If attorney Jennifer Davis was an agent of Grange and Davis delegated to Hyde the power to investigate on behalf of Grange, then the actions of Hyde were performed on behalf of Grange. *See* 19 Williston on Contracts § 54:15 (4th ed. 2022) ("An agent who appoints a subagent delegates to the subagent power to act on behalf of the principal that the principal has conferred on the agent . . . and the principal's legal position is affected by action taken by the subagent as if the action has been taken by the appointing agent."); *Tippecanoe Loan & Tr. Co. v. Jester*, 101 N.E. 915, 922 (1913) ("Where . . . the owner knows . . . . that the business cannot be transacted by the primary agent, and also knows of the fact of the employment of a subagent, the latter is nonetheless the agent of the principal . . . .").

First, the Court finds that Hyde, when conducting the testing on the lights on July 23, 2016, was acting as an agent of attorney Jennifer Davis. "To establish an actual agency relationship, three elements must be shown: (1) manifestation of consent by the principal, (2) acceptance of authority by the agent, and (3) control exerted by the principal over the agent." *Demming v. Underwood*, 943 N.E.2d 878, 884 (Ind. Ct. App. 2011). Hyde testified that his initial investigation was non-destructive because that was all Jennifer Davis had directed him to do. (DE 82-3 at 161:7–12.) Hyde stated that "if [Davis] would have directed me otherwise, I would have done what she asked me to do." (*Id*.) It was only when "Jennifer Davis instructed [him] to perform the other testing" that he followed through and conducted the allegedly destructive testing on July 23, 2016. (*Id.* at 161:16–19.)  Given that Davis's actions manifested consent to

13

Hyde conducting his testing on July 23, 2016, that Hyde, by testing the lighting system, accepted this authority, and that Davis controlled whether Hyde would perform his inspections tests and when he would perform these inspections, the Court finds that Hyde was acting as Davis's agent.

The next issue is whether Jennifer Davis was an agent of Grange. Under Indiana law, "*retention* confers on an attorney the general implied authority to do on behalf of the client all acts in or out of court necessary or incidental to the prosecution or management of the suit or the accomplishment of the purpose for which the attorney was retained." *Kmart Corp. v. Englebright*, 719 N.E.2d 1249, 1255 (Ind. Ct. App. 1999) (emphasis added). "Indiana courts have held that in the absence of fraud by the attorney the client is bound by the action of his attorney even though the attorney is guilty of gross negligence." *United Farm Bureau Mut. Ins. Co. v. Groen*, 486 N.E.2d 571, 573 (Ind. Ct. App. 1985).

Grange has admitted that it retained Davis several times. (DE 63-5 ("Grange *admits it retained Attorney Jennifer Davis of Garan Lucow*, pursuant to the terms of a Policy of Insurance, to defend Royal Paper Stock, Company & Jackie Hazeltine as of December 2, 2015." (emphasis added)); DE 66 at ("[A]ny communications between Jennifer Davis, her law firm, William and Thad Kelley, their law firm, and Grange are protected by the attorney-client privilege, as Ms. Davis, and Mr. William and Thad Kelley, were counsel *retained* by Grange to defend Royal Paper Stock."(emphasis added)). Because Grange retained Davis, Indiana law indicates that Grange is bound by the actions of Davis taken pursuant to the purpose for which Davis was retained. *See United Farm Bureau Mut. Ins. Co.*, 486 N.E.2d at 573 ("[An] attorney has *by virtue of the retainer or employment alone*, the general implied authority to do on behalf of the client all acts in or out of court necessary or incidental to the prosecution or management of the suit or defense or the accomplishment of the purpose for which he was retained." (emphasis added)).

Grange argues that because the purpose of retaining Davis was to provide Royal Paper with counsel, Grange cannot be bound by Davis's action. (DE 86 at 11 ("Grange was never in possession . . . of the Royal Paper Trailer, light assembly, bulbs and filaments" because "[t]he July 23, 2016 inspection and removal of the light assembly was performed by Adam Hyde, an accident reconstructionist retained by Royal Paper and Hazeltine counsel Jennifer Davis, in conjunction with Mr. Higginbotham, an expert retained by Auto-Owners."). The Court finds that because Grange does not provide any case citations in support of this proposition, this argument is waived. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").

Even if Grange had developed an argument, it would still be unpersuasive. In Indiana, both the insurer and the insured are considered clients of an attorney retained by an insurer to provide the insured a defense where there is no conflict of interest between the insurer and the insured. *See Cincinnati Ins. Co. v. Wills*, 717 N.E.2d 151, 161 (Ind. 1999) ("[W]hether the attorney is an employee or an outside lawyer, the debate focuses on whether only the insured or both the insured and the insurer should be viewed as the client. *We think it unrealistic to ignore the client relationship with both*.") (emphasis added); *Ranburn Corp. v. Argonaut Great Cent. Ins. Co.*, No. 4:16-CV-88-RL-PRC, 2018 WL 7953292, at *3 (N.D. Ind. Nov. 26, 2018) (finding that insurer was not client of attorney where the insurer created a conflict of interest by fully reserving its rights to not defend the insured, and distinguishing *Wills* because in that case no conflict of interest was present). In its briefing, Grange represents there is no conflict of interest between Grange and Royal Paper and Hazeltine and continues to defend Royal Paper and Hazeltine. (DE 66 at 16–17 ("Grange *is not adverse to its insureds*. Grange continues to provide

a defense for Royal Paper Stock Co. and its employees – it continues to retain William and Thad Kelley for the defense of its insureds in this very lawsuit.") (emphasis added)). The reason that Grange is defending Royal Paper is that it, as the insurer, has a significant interest in the outcome of the litigation:

> [U]sually neither insurance company nor insured has reason to believe that the insured's liability to the victim of the tort for which the insured is being sued will result in a judgment (if the case goes to trial) in excess of the policy limit. That means that as a practical matter *the insured has no interest in the litigation;* he is not paying for his attorney and will lose nothing if he loses the suit if we set to one side possible concerns with loss of reputation or with the insurer's upping his premiums for future coverage.

*R.C. Wegman Const. Co. v. Admiral Ins. Co*., 629 F.3d 724, 728 (7th Cir. 2011) (emphasis added). While one of its purposes for retaining counsel may have been to provide Hazeltine and Royal Paper with counsel, one reason Grange is providing this defense is obviously to reduce the potential liability that Grange itself will be responsible for under its policy with Royal Paper. Accordingly, the Court finds that it is proper to hold that Davis's actions in retaining Hyde bind Grange, given that the purpose of retaining Davis was in substantial part to reduce Grange's ultimate liability.

Not only does Indiana law support that Davis's actions are attributable to Grange as its agent, but that there is good reason to think that Grange was exercising substantial control over Davis at the time of Hyde's July 23, 2016, inspection. In a deposition, Hyde stated that Grange was paying the bill of Cooper Barrette, not Royal Paper and Hazeltine. (DE 81-3 at 9.) Furthermore, attorney Davis had consistent communications with Grange about defending potential litigation related to the crash. In a privilege log, Grange invokes attorney-client privilege over many communications with Davis. These correspondences, both from Davis to

Grange and vice versa, concerned subjects such as defense positions, liability assessment, defense strategy, future handling of evidence, attorney tasks, and motion practice. (DE 97-3.)

Given all of the above, the Court sees no reason not to apply the general rule that "retention confers on an attorney the general implied authority to do on behalf of the client all acts in or out of court necessary or incidental to the prosecution or management of the suit or the accomplishment of the purpose for which the attorney was retained." *Kmart Corp.*, 719 N.E.2d at 1255. Because Grange (a) admits it retained Davis, (b) paid Davis's bills, and (c) was in consistent correspondence with Davis about its defense strategy, the Court finds that Davis was Grange's attorney and had authority to undertake actions on behalf of Grange to advance its defense. One of these actions was an investigation into the circumstances of a crash. In doing so, Davis retained Cooper Barrette and Adam Hyde to perform testing on the lighting system of the semi-truck. As a result, Grange is liable for the actions taken by Hyde when performing this testing.

*(b) Knowledge of likelihood of litigation and importance of the lighting system*

With the agency issue out of the way, the Court now addresses whether Grange knew of the likelihood of litigation and the importance of the lighting system by July 23, 2016. The Court finds that Grange knew of the likelihood of litigation and the importance of the lighting system for three reasons: (1) Grange has already suggested in its privilege logs that it was anticipating litigation before July 23, 2016; (2) Grange has admitted that it was aware of a police report indicating that the semi-truck involved in the crash had an "inoperable tail lamp [with a plug] dangling loose" (DE 12 ¶ 99); and (3) the subagent acting on Grange's behalf issued a report in March 2016 indicating that one of the lights was broken.

Grange's privilege logs claim that numerous communications made before July 23, 2016, are privileged as work product because they were made "in anticipation of litigation." (DE 97-3). Grange claimed this privilege seven times for communications made prior to July 23, 2016. (DE 97-3.) By invoking this privilege, Grange is essentially admitting that it was preparing for the prospect of litigation prior to July 23, 2016. *See Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983) ("The test [for 'in anticipation of litigation'] should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.").

In its answer, Grange also made certain admissions which indicate it knew before July 23, 2016, that the crash resulted in serious injuries and that there were potential issues with the brake lights. Relative to injuries, Grange admitted "that it was aware [prior to the July 23, 2016 testing] that the driver died at the scene of the accident" and admitted "that it was aware that the other passengers [including Kedron] had been transported to the hospital for alleged injuries[.]" (DE 12 ¶¶ 103, 104.) Grange also admitted in its answer that "it was aware of the contents of the Indiana State Police Report prior to the July 23, 2016 testing," in which the State Police found that the semi-truck had an "inoperable tail lamp . . . [and a] plug dangling loose." (DE 12 ¶ 99.) Given that litigation is more likely when a serious injury results and where there is a potential defect, these admissions favor a finding that Grange knew, before July 23, 2016, of the likelihood of litigation and that the lighting system was important evidence to that potentials litigation.

A report issued by Hyde on March 1, 2016, also favors finding that Grange knew of the likelihood of litigation and that evidence of the lighting system would be important to Kedron's

potential claim. Adam Hyde issued a report on March 1, 2016, in which he noted that he conducted testing on all the lights, but that Light Number 3 "did not illuminate." (DE 87-5 at 6.) Hyde found that "parts of the bulb unit were broken resting at the base of the unit." (*Id.* at 7.) He also noted that he "found the electrical wiring for the broken right light hanging beneath the housing." (*Id.*) "Under the rule of imputed knowledge, the law imputes the agent's knowledge to the principal." *Hamilton v. Hamilton*, 132 N.E.3d 428, 433 (Ind. Ct. App. 2019). Accordingly, Grange can be said to have had knowledge about a potential lighting defect before July 23, 2016. This knowledge, along with the knowledge of the serious injuries, indicates Grange knew, or should have known, that there was a likelihood of litigation and that the lights on the semi-truck were potentially a key piece of evidence.

Despite the above, Grange asserts that it cannot have known of the likelihood of litigation by July 23, 2016, because Kedron had not yet brought her claim. This misstates Indiana law. Indiana courts have stated that knowledge of the likelihood of litigation *may* be shown by the filing of a claim. *Thompson*, 704 N.E.2d at 137 ("A liability carrier like the Insurance Company can rationally be held to understand that once a claim is filed, there is a possibility of litigation concerning the underlying injuries."). But filing the claim is unnecessary to demonstrate knowledge.[1] *See id.* ("[T]he relationship between the carrier and a third-party claimant could

---

[1] The bright-line rule that Grange proposes would result in perverse incentives. If an insurer's duty to preserve evidence only could be found after a legal complaint had been filed, this might incentivize undesirable behavior, including: (1) insurers rushing to destroy evidence as soon as possible, before suit is filed, especially if the insurer knows that a piece of evidence in their possession is important to a likely claim; and (2) litigants hastily filing claims because, otherwise, an insurer could not be held culpable for destroying said evidence. In a situation resulting in grievous injuries, such as death and incapacitation, it is possible that there may be a delay in bringing about the suit owing to the incapacitation. For example, in this case, Kedron Gaston was a minor when the crash occurred, killing her aunt and incapacitating her mother. In such a scenario, an insurer may very well be aware of the prospect of litigation because of the severity of the crash and apparent defects, but the actual filing of the suit could be delayed because of personal circumstances. And yet, under Grange's desired rule, the insurer would be perfectly within its rights to destroy the evidence, despite its actual knowledge of the importance of that evidence and that litigation was likely. Prudently, this outcome is unsupported by Indiana law, which imposes a more flexible standard asking whether the insurer knew of the likelihood of litigation and the importance of the evidence in its possession.

warrant recognition of a duty if the carrier knew or should have known of the likelihood of litigation and of the claimant's need for the evidence in the litigation[.]"); *Am. Nat. Prop. & Cas. Co. v. Wilmoth*, 893 N.E.2d 1068, 1071 (Ind. Ct. App. 2008) (holding that insurer did not know of likelihood of litigation based on plaintiff not bringing a claim before the disposal of evidence *and* where the insurer could not have anticipated the need for "key item of evidence," but not on failure to bring claim alone); *Yan v. Illinois Farmers Ins. Co.*, No. 1:03-CV-1980-SEB-JPG, 2005 WL 2175525, at *6 (S.D. Ind. Sept. 2, 2005) ("More persuasive in distinguishing the case at bar from the *Thompson* decision is the fact of the opportunity [plaintiff here] had to alert [the insurer] to the prospect of possible or intended litigation."). From the evidence discussed above, including the admission in Grange's privilege logs that it anticipated litigation, the Court finds that Grange knew, before July 23, 2016, that litigation was likely and that the lighting system would be important to that litigation.

### (c) Possession of lighting system on July 23, 2016

Next, Grange argues that Hyde did not have exclusive possession over the lighting system and that this strongly weighs against the imposition of a duty. In support of its argument, Grange relies on *Kelly v. Patel*, 953 N.E. 2d 505 (Ind. Ct. App. 2011) for the proposition that Indiana cases "all contemplate or require that the insurer [have] exclusive possession of the evidence at the time of the spoliating act." (DE 86 at 11.) There are several flaws with this argument.

First, exclusive possession at the time of the spoliating act is not required. Indiana courts have repeatedly held that exclusive possession is unnecessary to create a duty on the part of an insurer. *Am. Nat. Prop. & Cas. Co.*, 893 N.E.2d at 1072 ("We decline . . . to hold an insurer can never owe a third party a duty to preserve evidence unless it has exclusive possession of the

evidence[.]"). Rather than hold that exclusive possession is always required, the Court in *Kelly* reaffirmed that it was *not* required. *Kelley*, 953 N.E.2d at 510 (noting that the lack of "exclusive possession" was "not per se dispositive, as *Wilmoth* declined to limit the duty to preserve evidence to instances when an insurer physically takes possession of certain evidence").

 *Kelly* supports that a duty exists where an insurer's agent takes affirmative steps to alter evidence in the agent's actual possession, which the insurer knows is important to likely litigation. In *Kelly*, the plaintiff argued that "a reasonable trier of fact could find [a] duty was breached when [the insurer] *allowed its insured* . . . to dispose of everything in the room." *Kelley*, 953 N.E.2d at 508 (emphasis added). The court held that the spoliation claim had to be dismissed because the "only allegation is that [the insurer] failed to advise the [insured] to preserve evidence, not that *[the insurer] affirmatively acted to destroy evidence to avoid or lessen its liability*." *Id.* at 511 (emphasis added). Unlike *Kelley*, Kedron presented evidence supporting that it was Grange, through its subagent Hyde, who possessed the lighting system, rather than merely the insured party. Kedron also presented evidence that Grange knew of the importance of the lighting system and the likelihood of litigation. Finally, Grange, as an insurer who would be liable if a successful negligence claim was brought against its insured, had a financial incentive to destroy the lighting system as this evidence could be harmful to its defense. Other courts have found the presence of such a motive to be significant. *See J.S. Sweet Co.*, 400 F.3d at 1034 (7th Cir. 2005) (finding no duty, explaining that *Thompson* was distinguishable because there "the party alleged to have spoliated the evidence had a direct financial stake in the outcome of the underlying litigation" because "had the landlords been found liable, the insurance company would have had to indemnify them").

Given the circumstances of this case, the Court finds that the actual possession of the evidence by an agent of an insurer who knows the evidence is important to likely litigation, and has a financial motive to destroy said evidence, triggers an insurer's duty to exercise reasonable care in preserving that evidence. "Actual possession occurs when a person has direct physical control over the item." *See Henderson v. State*, 715 N.E.2d 833, 835 (Ind. 1999). Adam Hyde's deposition indicates that he had actual possession of the lighting system when he conducted the allegedly destructive testing on July 23, 2016. Hyde explained that, on July 23, 2016, he "first photographed [the lights] at the start of the inspection, documented them, then removed them from the trailer." (DE 97-1 at 118:13–21.) Hyde testified that he was the one who followed through with the testing on July 23, 2016, after Jennifer Davis instructed him to. (DE 81-3 at 161:16–19.) Hyde also testified to making eight cuts with a Dremel tool to the lights on July 23, 2016. (DE 12 ¶ 109.) Finally, after the testing, Hyde wrapped the lights in bubble wrap and kept them. (*Id.* ¶ 115.) Hyde's actual possession of the lighting system on July 23, 2016, means Hyde's principal, Grange, had constructive possession over the lighting system on July 23, 2016. *Adsit Co. v. Gustin*, 874 N.E.2d 1018, 1027 (Ind. Ct. App. 2007) ("[W]e find that when German Auto Tops—Adsit's agent—had actual possession of the returned goods, Adsit, in turn, had constructive possession thereof."). Accordingly, because Grange had constructive possession over the lighting system, knew of the likelihood of the litigation, knew of the importance of the lighting system, and had a financial motive to destroy the evidence, it (and its agents acting on its behalf) had a duty to exercise reasonable care in preserving the lights when testing them on July 23, 2016.

Even if Grange were correct that exclusive possession is required, based on the evidence submitted, Hyde had exclusive possession over the lights when the destructive testing occurred.

In its response to Kedron's statement of material facts, Grange states that Hyde's inspection was performed in conjunction with an agent of Koehler's insurer, Erin Higginbotham. (DE 85 ¶ 18.) In support of this assertion, Grange only cites "Ex. D-2." (*Id.*) But Grange cites no "page or paragraph number" and so, according to the local rules, the Court finds that this factual assertion is unsupported. N.D. Ind. L.R. 56-1(e) ("The court may find a fact is not supported if the citation does not include a page or paragraph number to evidence in the record which can be presented in an admissible form unless the court may take judicial notice of the fact."). Additionally, as Kedron points out in her reply, the exhibit cited by Grange (D-2) does not support Higginbotham being present, nor that Higginbotham ever had actual possession over the lighting system when it was being tested.[2] Accordingly, the only evidence this Court has concerning the possession of the lighting system when it was being tested on July 23, 2016, are the depositions of Hyde and the admissions of Grange. These depositions support the inference that Hyde was the only one in possession of the lighting system that day and has possessed the lights ever since. Since there is no other evidence in front of this court suggesting that any other party had actual possession over the lights that day, the Court finds that Hyde's possession over the lighting system was exclusive.

Based on Grange's knowledge of the likely litigation and the importance of the lighting system, and the actual possession of the lighting system by one of its agents at the time of the alleged spoliation, the Court finds that Grange had a duty to exercise reasonable care to preserve that evidence.[3]

---

[2] Another portion of the record, submitted by Plaintiff, does indicate Higginbotham was present at a review that occurred on April 21, 2016. (DE 97-1 at 153:3–6.) But this does not suggest that Higginbotham was present at the testing that occurred on July 23, 2016, or that he had actual possession of the lighting system.

[3] As in *Thompson*, the three *Webb* factors have been satisfied. First, Grange had a special relationship with Kedron because Grange knew of the likelihood of litigation and that evidence in Grange's possession would be important.

**D.        Conclusion**

For the reasons explained above, the Court GRANTS the motion for summary judgment as to the element of duty in Kedron's spoliation claim but DENIES the motion for summary judgment as to the element of breach of duty.


SO ORDERED.

ENTERED: May 4, 2023

/s/ JON E. DEGUILIO

Chief Judge
United States District Court

---

*Thompson*, 704 N.E.2d at 137 ("The Insurance Company's knowledge and investigation of the Thompsons' claims and its possession of what would be a key item of evidence in the event litigation ensued created a relationship between the Company and the Thompsons that weighs in favor of recognizing a cognizable duty to maintain evidence."). Second, the harm to Kedron from altering this evidence loss was foreseeable to Grange, given that Grange thought the lights were important enough to test multiple times and that a previous report by Hyde had reflected that one of the lights was broken. *Id.* at 138 ("Further, the foreseeability of the harm in losing evidence can be inferred from the allegation that the Company's investigator took possession of the cable: if an insurance carrier's investigator deems certain evidence important enough to be collected, it is foreseeable that loss of the evidence would interfere with a claimant's ability to prove the underlying claim."). The likelihood of harm was serious enough that a reasonable insurer would have taken precautions. *Goodwin*, 62 N.E.3d at 392. Finally, like in *Thompson*, recognition of a duty tracked public policy, since "it is reasonable for the law to require that claims resolution practices be responsible, because the carrier has the unique experience and ability to structure its practices to avoid harm." *Id.*